van Gestel, J.
This matter is before the Court for findings, rulings and an order for judgment on the counterclaim by the defendant, Admiral Insurance Agency, Inc. (“Admiral”), brought pursuant to Mass. G.L.c. 93A, Secs. 2 and 11. This case was tried to a ury on the complaint by the plaintiff, Savers Property & Casualty Insurance Company (“Savers”), commencing on October 3, 2000. The Court reserved the c. 93A counterclaim for decision by itself, without asking the jury for an advisory opinion.
The case involves a claim by Savers, as an insurer, against Admiral, a sub-agent, for damages allegedly sustained as a result of the actions and inactions of Admiral which caused Savers to become obligated to issue an insurance policy to the Massachusetts Port Authority (“Massport”) and ultimately pay $2,000,000 under that policy. Count I of Savers’ complaint, sounding in ordinary negligence, was submitted to a jury. At the close of Savers’ case, the Court directed verdicts in Admiral’s favor on Count II alleging common law indemnity and Count III alleging negligent misrepresentation.
Admiral brought a counterclaim against Savers, alleging that there were no misrepresentations on its part and that it had proper authority to bind Savers to the policy in issue. Admiral then charged in its counterclaim that the allegations by Savers against it in the complaint in this case are “baseless, conjectural and speculative and have been made with a knowing and intentional disregard of the truth.” Thus, claims Admiral, Savers is in violation of G.L.c. 93A, Secs. 2 and 11.

*595
FINDINGS OF FACT

The Court makes the following findings of fact. These findings are not all of the facts presented at the two-week trial of this case. Rather, they focus solely on the issues necessary to determine the c. 93A counterclaim.
Savers, a duly organized Missouri insurance company, in 1995 and 1996, through its general agent for these purposes, Customized Worldwide Weather Insurance Agency, Inc. (“CWW”), was involved in a snow insurance program. Admiral, a duly organized Massachusetts insurance agency, acted under a contract with CWW to market snow insurance in Massachusetts and elsewhere.
The snow insurance program was designed to assist municipalities and other governmental entities to moderate the sometimes huge economic effect on their snow removal budgets caused by unanticipated heavy snowfalls. The risks were accepted on different criteria, sometimes predicated on a per-storm basis and sometimes on a per-inch-during-a-season basis. The policy with Massport in question here was the per-inch-per-season variety; e.g., for each inch of snow in excess of 44" falling at Logan Airport, up to 84", Savers became obligated to pay Massport $50,000. The premium for this coverage was $400,000 for the 1995/1996 winter, with only $300,000 having to be paid if there were no claims made against the policy.
The underwriting and quoting for policies under this program were performed for Savers by CWW, pursuant to an agency agreement between Savers and CWW. Under this program, Savers contends that there was a specific order of events leading up to the issuance of a policy, which order was critical and key to its becoming obligated on a given risk. That order was: (1) after negotiations, the potential insured must submit a written application, which application contained clear language to the effect that the insurer was not obligated to provide coverage until it considered and accepted the risk and until the premium was paid; (2) next, an agreed-upon premium was to be paid; and (3) only then would Savers accept or reject the application and, if it accepted, Savers would issue the policy or authorize CWW to issue a binder. Supposedly, in part at least, this procedure was designed to avoid adverse selection by the insured[1] and to protect the insurer from getting over-committed.
Here, there was some evidence that the full details of the program never reached Admiral from CWW or that Admiral and CWW were both so anxious to land Massport as a snow insurance customer that Admiral did not follow the steps outlined above.
In this case CWW, with some assistance from Admiral, negotiated with Massport for several months until, in late September 1995, the Massport Board voted to purchase a policy through Admiral. Upon learning of this vote, Admiral, possibly at the urging of Massport’s broker, issued an Acord Insurance Binder to Massport on October 2, 1995. The binder listed Savers as the insurer and set forth the basic elements of the coverage, with a policy inception date of December 15, 1995. At this time neither Savers nor CWW were aware of the issuance of the binder. Also, Admiral had no actual authority to issue such a binder, although it may have had some ostensible or apparent authority to do so.
In mid-October 1995, Massport’s broker, after deducting its own commission, transmitted $270,000 as the premium to Admiral. Admiral in turn, after deducting what it believed to be its commission, transmitted $261,000 to CWW. Again, Savers was not advised of the payment of this premium or its receipt by its agent CWW.
From mid-October until mid-November, CWW was chasing Admiral, and Admiral in turn, chasing Massport, for an executed application. That application was finally executed on behalf of Massport and sent to Admiral on or about November 15, 1995. Admiral promptly sent the application to CWW. Apparently, CWW did not advise Savers of its receipt of the application. Admiral communicated only with CWW, to whom it was a sub-agent.
December 15, 1995, the inception date of the Massport snow insurance coverage, came and went with no action or notice being conveyed to Massport that it was not fully insured. From its point of view, the insurer, or at least its agent, had Massport’s premium money and its signed application, and Massport had the binder issued by Admiral.
On January 6, 1996, there was a blizzard of some significant proportions at Logan Airport. On January 9, 1996, a reporter from the Reuters News Agency telephoned Savers to inquire about its coverage of Massport for snow removal costs. This was the first time that Savers became aware that a binder had issued, premium had been paid, and an application was in the hands of its agent CWW.
Savers concluded that it was obliged to provide coverage to Massport and ultimately, in late June 1996, paid $2,000,000 on the claim. There followed an arbitration proceeding between Savers and CWW, pursuant to the agency contract between the two, and this separate lawsuit by Savers against Admiral.

RULINGS OF LAW

G.L.c. 93A, Sec. 11 provides, in material part, as follows:
Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as *596 hereafter provided, bring an action in the superior court . . . whether by original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper. [Emphasis added.]
G.L.c. 93A, Sec. 2(a) reads as follows:
Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. [Emphasis added.]
G.L.c. 93A, Sec. 11 refers to “marketplace” transactions. See, e.g., Manning v. Zuckerman, 388 Mass. 8, 12-13 (1983); Slaney v. Westwood Auto, Inc., 360 Mass. 688, 695-97 (1975). The filing of a lawsuit in the Superior Court is not “the use or employment ... of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two” of G.L.c. 93A. It is not a marketplace transaction, nor is it something done “in the conduct of any trade or commerce.” Thus, for that reason alone Admiral’s c. 93A counterclaim — predicated as it is solely on the filing by Savers of this lawsuit— cannot survive.
What Admiral really seems to be seeking is relief pursuant to G.L.c. 231, Sec. 6F or presenting a claim for malicious prosecution or abuse of process. None of those three kinds of proceedings applies here, however.
G.L.c. 231, Sec. 6F provides relief for claims that are found to be “wholly insubstantial, frivolous and not advanced in good faith.” That is not the case here. There was more than adequate basis for Savers to seek the relief it did. Further, Of course, c. 231, Sec. 6F relief can only come “upon motion of a parly... in which a finding, verdict, decision, award, order or judgment has been made by a judge or justice or by a jury ...” And the motion must be decided after a hearing out of which the Court must make a “separate and distinct finding” of the alleged deficiencies. At the time of the trial of this matter, the seeking of c. 231, Sec. 6F relief is — if it exists at all — premature.
Similarly, an action for malicious prosecution has as predicate elements the filing and termination in the claimant’s favor of a prior proceeding, Pilos v. First Nat. Stores, Inc., 319 Mass. 475, 477-78 (1946), and a determination that the prior proceeding was instituted without reasonable and proper cause. Rosenblum v. Ginis, 297 Mass. 493, 497 (1937); Kelsea v. Swett, 234 Mass. 79, 81-82 (1919). Again, itis premature to make a malicious prosecution claim. Further, as noted above, there was ample cause for Savers to bring this action. See, e.g., Muniz v. Mehlmen, 327 Mass. 353, 359-360 (1951).
Abuse of process requires a showing of a malicious use of process to compel the defendant to do some collateral thing which it could not lawfully be compelled to do. The process must have been used to compel some ulterior purpose. Ladd v. Polidoro, 424 Mass. 196, 198 (1997). Bringing a lawsuit to recover damages for alleged tortious conduct is not a use of process for an ulterior purpose.

ORDER FOR JUDGMENT

For the foregoing reasons, the Court orders that the counterclaim of the defendant, Admiral Insurance Agency, Inc., be dismissed.

For example, an insured might apply for the insurance, receive a policy or binder, check the long range weather report and find that a light snow fall was expected, and then refuse to pay the premium. It is for this reason, Savers claims, that the premium had to be paid before the policy issued and Savers became bound on the risk.